**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | |
|---|---|
| In re: | Case No: 24-32447 |
| ROMANCE WRITERS OF AMERICA, INC., a Texas corporation, | Chapter 11 (Subchapter V) |
| Debtor and Debtor-in-Possession. | |

**DECLARATION OF MARY ANN JOCK IN SUPPORT OF**
**CHAPTER 11 PETITION AND FIRST DAY PLEADINGS**

I, Mary Ann Jock, hereby declare under penalty of perjury as follows:

I am President of Romance Writers of America, Inc. ("**RWA**" or "**Debtor**"), the debtor and debtor in possession in the above-captioned subchapter v case (the "**Subchapter V Case**" or "**Case**"). I have served in such capacity since January 2022, when the president at that time had to step down. I was then voted to be President by the membership and have been voted in by the membership for the next 2 fiscal years (2022-23 and 2023-24. Prior to this I served one term as a director-at-Large on the RWA national board of directors. As President and a member of the executive committee of the Board, I have been very involved with RWA's efforts to strengthen and reinvigorate its operations the last couple of years. I also have been a member of RWA since 2003 and have served as a chapter leader and attended many national conferences. As a result, I am familiar with RWA's business. I also am an author of 7 published romance novels and have been involved with the romance writing industry for more than 20 years.

I am over the age of eighteen and authorized to submit this declaration (the "**Declaration**") on behalf of the Debtor, and if called on to testify, I could and would testify competently to the facts set forth in this Declaration.

1

In my capacity as President for the Debtor, I submit this Declaration in support of the Debtor's petition for relief under subchapter v of chapter 11 of title 11 of the United States Code (the "**Bankruptcy Code**") filed on the date hereof (the "**Petition Date**") and the relief requested pursuant to the Debtor's applications and motions filed contemporaneously herewith (collectively, the "**First Day Motions**").

I am familiar with the Debtor's operations, business affairs, books and records, and circumstances leading to the Subchapter V Case. Except as otherwise indicated herein, all facts set forth in this Declaration are based on (a) my personal knowledge of the Debtor's operations and finances, and/or my review of the Debtor's books and records, or relevant documents, (b) information I received from the Debtor's management team and its advisors, and/or (c) my opinion based upon my experience in the romance writing industry.

For almost three years, I, and the Board of the Debtor, have been working with the Debtor's management and administrative teams (internal as well as outsourced) to evaluate and address its financial condition and navigate through the Debtor's liquidity constraints, among other things. As explained further below, in connection with the Debtor's desire to pursue restructuring alternatives through the Subchapter V Case, I was designated the responsible person for the Debtor in connection with the Case.

## INTRODUCTION

RWA was compelled to commence this Subchapter V Case due to substantial legacy obligations related to conference centers that are threatening RWA's ability to continue to operate. Without such substantial legacy obligations, RWA can continue with its nonprofit mission. For more than 40 years, the Debtor has been, and continues to be, a nonprofit with a mission to advance the profession of romance writing, as more fully described below. Prior to 2019, the

Debtor had approximately 10,000 members. In 2018, the Debtor entered into agreements with various Conference Centers to host the Debtor's annual Keynote Conference through 2026 (which was extended during COVID to 2028). However, for various reasons, since that time, RWA's membership declined to approximately 2,000 members and RWA no longer requires, nor can it afford, to hold its Keynote Conference at the Conference Centers pursuant to the Conference Contracts.

As noted below, aware of its financial constraints, in 2022, RWA with assistance from its advisers, reached out to each of the remaining Conference Centers that had a Conference Contract explaining the change in circumstances and seeking to either (at the Conference Center's option) terminate the applicable Conference Contract or amend the agreement to limit the number of rooms, and related services, that RWA would require for the applicable Keynote Conference. RWA hoped (and expected) that with such advance notice, each remaining Conference Center would have ample time to resell the conference space and mitigate any damages. RWA was able to negotiate a termination or amendment of the applicable Conference Contract with all the Conference Centers except for Philadelphia Marriott for the summer of 2025, which refused to modify or terminate the original agreement despite RWA's inability to pay.

In addition, while Marriott Austin (for the summer 2024 Keynote Conference), agreed to an amendment in 2022, Marriott Austin asserts that it has only sold some of the released Excess Rooms, and therefore RWA expects it will receive a substantial damages claim from Marriott Austin, which the Debtor does not have the ability to pay. Lastly, the Debtor had settlement discussions with Anaheim Marriott from the summer of 2023, which appears to be owed payment relating to released Excess Rooms that the Conference Center was unable to resell, but as of the date of this filing, the parties did not reach an agreement on a settlement amount.

Compelling the filing at this time, Philadelphia Marriott recently accelerated RWA's payment obligations under the applicable 2025 Conference Agreement, demanding immediate payment of over $1 million based on a presumed termination. Unfortunately, as disclosed to Philadelphia Marriott, RWA simply does not have the ability to pay such damages amount. Except for the Marriott Conference Obligations, RWA is generally able to meet its financial obligations through revenues and donations that it receives as a nonprofit organization. However, without a consensual resolution with the Marriott Conference Center holdouts, RWA was compelled to file the Petition seeking Subchapter V relief in order to allow it to continue to provide services to its members and the romance writing community.

The Debtor will seek to reject the Conference Contracts as of the Petition Date. The Debtor also is filing a proposed plan of reorganization substantially contemporaneously with the Petition, which provides for the reinstatement of the Debtor's sole secured debt with SBA, and the payment of the Debtor's disposal income for the next three (3) years to its unsecured creditors, including the Marriott Conference Centers, in accordance with the requirements of Subchapter V. The Debtor believes the plan is fair and equitable and satisfies the requirements for a prompt confirmation under Subchapter V.

## BACKGROUND OF DEBTOR

### A.   Brief History of Debtor

Incorporated in 1981, the Debtor is a 501(c)(6) Texas nonprofit corporation with a mission to advance the profession of romance writing, including through, among other things, providing education programs, networking opportunities, and advocating for fair business practices for romance writers. RWA has been impactful in advocating for the romance industry when it would have otherwise been dismissed being a largely female based industry. RWA provides romance

authors, who often are marginalized in the publishing industry, the connections and resources they need to succeed.

RWA has 28 online and local chapters. RWA's local chapters are affiliated via contract and offer members the opportunity to come together in person to discuss the publishing industry and build connections with fellow romance writers in their geographic area. RWA chapters generally meet once a month and often feature guest speakers, host local events, provide networking opportunities, and give RWA members the chance to talk with those who understand the ups and downs of the writing life.

RWA's online chapters are affiliated via contract and are made up of members interested in a particular subset of romance fiction. These chapters meet online and offer education and support tailored to the needs of writers who are interested in these romance subgenres. None of RWA's chapters (local or online) are part of the Debtor's Subchapter V Case (except as counterparties to contracts).

At a national level, RWA provides, among other things, an opportunity for members from all chapters to come together for the Keynote Conference (discussed below), offers special programming and events (such as Traditional Authors Weekend, Indie Author Weekend, and other classes and webinars), coordinates lobbying and other efforts, as needed, to protect rights of romance authors, and promotes awards and other educational programs for RWA members and nonmembers in the romance writing industry. Without organizations such as RWA there would be little oversight for illegal and/or unethical behavior concerning intellectual property of authors and illustrators (*e.g.*, RWA has been active in protecting authors rights concerning AI developments).

The Debtor's source of income is derived from the membership fees paid by its members, payments received from educational programs, conferences, and donations. Prior to 2019, the Debtor had approximately 10,000 members. Its premiere event was an annual summer conference ("**Keynote Conference**") at which typically more than 2,000 people attended. In 2018, RWA entered into contracts for conference space with various Marriott conference hotels in the United States ("**Conference Centers**") to utilize for its Keynote Conference each year through 2026 (collectively, the "**Conference Center Contracts**"). To obtain those Conference Center Contracts, the Debtor used the events sourcing services of Maritz Global Events – AT&L Inc., f/k/a Experient Inc. ("**Maritz**") pursuant to a Master Services Agreement between the Debtor and Maritz, dated August 1, 2014 and subsequent Statement of Works (SOW), and amendments to SOWs (collectively, including any and all amendments or modifications thereto, the "**Maritz Agreement**", and collectively with the Conference Center Contracts, the "**Conference Contracts**").

Subsequently, predominantly due to disputes concerning diversity, equity, and inclusion (DEI) issues between some members of a prior RWA board and others in the larger romance writing community, membership decreased to approximately 3,000. Due to COVID concerns, the Debtor held its annual conference virtually in 2020 and 2021, and subsequently its membership reduced further. RWA was able to postpone its obligations to the respective Conference Centers these two years by agreeing to add two future years to the applicable Conference Center Contract to 2028.

B.     **RWA's Efforts to Right-size Operations and The Conference Contracts**

In an effort to reduce expenses and right-size its operations to the reduced membership level, RWA substantially reduced its employee headcount, reducing its internal workforce to three

employees in 2021. During 2021, membership renewals did not hit the Debtor's targets due to the DEI issues facing the prior Board and the ongoing pandemic. RWA made efforts to address and remedy DEI issues by, among other things, reconstituting the Board in September 2021. The new Board retained restructuring advisers and focused its efforts on rejuvenating the Debtor and increasing its value propositions for its members to return the Debtor to its past glory days and beyond. RWA further scaled-back on expenses and engaged in various revenue generating efforts.

Significantly, in 2022, RWA with assistance from its advisers, reached out to each of the remaining Conference Centers explaining the change in circumstances and seeking to either terminate or amend the applicable Conference Center Contract. Understanding that it may be easier to resell the conference space if the Conference Contract was terminated entirely (and might also benefit RWA), RWA gave each Conference Center the option to terminate the Conference Contract or amend the agreement to limit the number of rooms, and related services, that RWA would require for the applicable Keynote Conference. The amendments "released" the unneeded room blocks allowing the Conference Center to seek to resell those rooms (the "**Excess Rooms**"), but under the amendments the Conference Centers did not allow RWA to be released from liability to the extent those Excess Rooms were not resold. RWA hoped (and expected) that with such advance notice, each remaining Conference Center would have ample time to resell the Excess Rooms and mitigate any damages. RWA was able to negotiate a termination or amendment of each remaining Conference Contract with the Conference Centers except for Philadelphia Marriott Downtown ("**Philadelphia Marriott**") for the summer of 2025, which refused to modify or terminate (without substantial damages) the original agreement despite RWA's inability to pay.

As a result of such efforts, RWA was able to have its annual Keynote Conference in 2022, and subsequently was able to pay the Conference Center for all services RWA utilized and

7

negotiate a resolution of amounts due under the amendment for the Excess Rooms. In 2023, although pre-conference demands by the Conference Center made the conference challenging, RWA was again able to have its annual Keynote Conference in 2023 at the applicable Conference Center (Anaheim Marriott), and subsequently had settlement discussions with Anaheim Marriott respecting amounts owed relating to Excess Rooms that the Conference Center was unable to resell, but as of the date of this filing, the parties did not reach an agreement on a settlement amount.

In late summer of 2023, to reduce expenses further and also benefit from an experienced nonprofit management team, the three employees were either terminated or resigned, and as of September 1, 2023, the Debtor has been administered by an outside management company, AMC Source ("**AMC**"). AMC provides management services to nonprofit trade and professional associations, such as the Debtor. Accordingly, the Debtor has no employees. It is governed by a voluntary board of directors ("**Board**") who are elected by the members of the Debtor (on an annual basis), and administered by AMC, who reports to the Board.

The efforts of the Board and AMC with programs and membership engagements have begun to make a difference and the Debtor's revenue generally has been sufficient to cover its costs. In particular, through those efforts, RWA has revitalized a number of its signature programs, including Pen to Paper, Paper to Polish, Indy Author Weekend, Traditional Author Weekend, and others. Those initiatives not only increased participation but also generated additional revenue for RWA. RWA, with AMC's assistance, also just completed its transition to a new member management system that is more economical and more responsive and adept at meeting the needs of its members.

**EVENTS LEADING UP TO THIS SUBCHAPTER V CASE**

Despite the positive current trend of RWA's business, RWA is faced with the looming liabilities from the remaining legacy Marriott Conference Contracts. While JW Marriott Austin ("**Marriott Austin**") for the summer 2024 Keynote Conference, agreed to an amendment in 2022, Marriott Austin asserts that it has only sold some of the "released" Excess Rooms, and therefore RWA expects it will receive a substantial damages claim from Marriott Austin. RWA cannot risk its members having issues with its Keynote Conference due to uncertainty of the obligations that RWA will owe to Marriott Austin. RWA recently informed Marriott Austin to release all rooms, cancelling its reservations with Marriott Austin for this summer.

Moreover, despite being aware of the Debtor's financial constraints (and the option to resell Excess Rooms) since 2022, Philadelphia Marriott recently accelerated RWA's payment obligations under the applicable 2025 Conference Contract, demanding immediate payment of over $1 million based on the full amount that would be owed under the termination provision of the Conference Contract (even though RWA had not terminated the contract). A true and correct copy of the Philadelphia Marriott demand letters (without attachments) is annexed hereto as **Exhibit A**. (Obligations under the Conference Contracts with Anaheim Marriott, Marriott Austin and Philadelphia Marriott are collectively referred to herein as the "**Marriott Conference Obligations.**") Unfortunately, as disclosed to Philadelphia Marriott, the Debtor simply does not have the ability to pay such damages amount. Excluding the Marriott Conference Obligations, RWA is generally able to meet its financial obligations through revenues and donations that it receives as a nonprofit organization. However, as a nonprofit faced with limited liquidity, in light of the Philadelphia Marriott's demand for immediate payment and without a consensual resolution with the Marriott Conference Centers, RWA was compelled to file the Petition seeking Subchapter

9

V relief in order to allow it to continue to provide services to its members and the romance writing community.

## THE DEBTOR'S BANKRUPTCY FILING AND FINANCIAL STATUS

As of the Petition Date, substantially all the Debtor's assets were encumbered by a lien relating to a secured loan with U.S. Small Business Administration ("**SBA**"), which has a balance due of approximately $145,000. The Debtor estimates that it has approximately $74,500 in unencumbered (and undesignated) cash and approximately $3 million in asserted unsecured liabilities. The Debtor also holds approximately $18,500 in designated funds for chapters and $146,900 in designated donations. A true and correct copy of the Debtor's 13-week cash projections budget is annexed hereto as **Exhibit B**. The Debtor owns no real property and is not party to any real property leases. The Debtor runs a lean operation with no employees, and outsources administrative services to AMC, which reports to the Board. The Debtor relies on volunteer Board members and other volunteers to assist with its operations. The Debtor filed the Subchapter V Case in order to preserve its assets for its entire estate and obtain a fresh start. The proposed Plan being filed contemporaneously herewith, provides for the Debtor's projected disposable income to be distributed to the remaining Marriott Conference Centers and other unsecured creditors, as set forth in the Plan. The Debtor expects to emerge from Subchapter V expeditiously and be able, once again, to operate within its revenue and donations limits.

## THE FIRST DAY MOTIONS

Contemporaneously with the filing of this Declaration, the Debtor has filed or will file the First Day Motions to minimize the disruption and adverse effects of the commencement of the Subchapter V Case on the Debtor's operations and members, and to preserve value for its estate, creditors, and all stakeholders.

The First Day Motions are:

- Cash Management Motion - *Debtor's Motion For Interim And Final Orders Authorizing Debtor To Continue Use Of Existing Bank Accounts, Cash Management System And Business Forms, And Granting Related Relief*

- Cash Collateral Motion - *Debtor's Motion For Entry Of Interim And Final Orders (I) Authorizing The Use Of Cash Collateral, (II) Granting Adequate Protection (III) Scheduling A Final Hearing, And (IV) Granting Related Relief*

- Motion to protect Members' Personal Information and Approve Form and Scope of Notice - *Debtor's Motion For Entry Of An Order (A) Approving Scope And Manner Of Notice To Debtor's Members, (B) Authorizing Debtor To Redact Certain Personally Identifiable Information, And (C) Granting Related Relief.*

With its Petition, the Debtor also filed the following motion, which it expects to be heard on regular notice:

- Motion to Reject Certain Executory Contracts - *Debtor's Omnibus Motion For Entry Of An Order Authorizing Rejection Of Certain Executory Contracts Nunc Pro Tunc To Petition Date And Granting Related Relief.*

I have reviewed each of the motions filed on the Petition Date including the First Day Motions (including the exhibits and schedules attached thereto) listed above (collectively, the "**Motions**"), and the facts set forth in the Motions are incorporated herein by reference.  To the best of my knowledge, the facts set forth in each of the Motions are true and correct.   If called upon to testify, I could and would testify competently to the facts set forth in each of the Motions, and I believe the relief requested in each of the Motions is in the best interests of the Debtor's estate, creditors and other stakeholders.

As described in the First Day Motions, I believe that the Debtor's request for interim relief is narrowly tailored, or where the requested payments would otherwise be entitled to priority over general unsecured claims, under the Bankruptcy Code. It is my opinion that the relief sought in the First Day Motions is essential to avoid uncertainty and to allow the Debtor to operate without disruptions, as well as to preserve the value of the Debtor's estate, and is in the best interests of the Debtor's estate, creditors and other stakeholders.

## **CONCLUSION**

For the reasons described herein and, in the Motions, I believe that the relief requested in the Motions should be granted by the Court, with such other and further relief for the Debtor as this Court deems just and proper, in the most expeditious manner possible.

*[Signature Page Follows]*

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge and belief.

Executed on: May 29, 2024            By: _____
                                        Mary Ann Jock, President

12

# EXHIBIT A



Steven M. Rudner

April 15, 2024

*Via US Mail and Via email  (ccallari@raineslaw.com)*
Ms. Carollyn H.G. Callari
Partner
Raines Feldman Littrell LLP
1350 Avenue of the Americas
22nd Floor
New York, New York 10019

Re:    Philadelphia Marriott Downtown / Romance Writers of America

Dear Ms. Callari:

I am writing in follow-up to my letter to you on February 20, 2024.

Your client has failed to make the payment demanded in that letter.  Your client has anticipatorily breached its contract with the Philadelphia Marriott Downtown, as the result of which (a) your client is deemed to have canceled its meeting at the hotel, which will no longer occur at the hotel, and (b) your client owes damages for that cancellation.

Using thirty days after my February 20 letter to you as the deadline for payment and thus, the date of the breach, the contract sets liquidated damages for the cancellation as seventy-five percent of the contracted rooms revenue (which in turn is defined as the number of contracted sleeping rooms multiplied by the average single room rate), the amount due for your client's cancellation is $1,071,198.  Please consider this letter as the hotel's invoice and demand for immediate payment of that amount.

Sincerely,

Steven M. Rudner

12740 Hillcrest Road . Suite 240 . Dallas . Texas . 75230 . Main 214.373.1900 . email. rudner@hotellawyers.com



February 20, 2024

<u>Via E-mail (ccallari@raineslaw.com)</u>
Carollyn H.G. Callari, Esq.
Partner
Raines Feldman Littrell LLP
1350 Avenue of the Americas,
22nd Floor
New York, NY 10019

      Re:    Philadelphia Marriott Downtown / Romance Writers of America

Dear Ms. Callari:

      It is my pleasure and honor that the Philadelphia Marriott Downtown is among the thousands of fine hotels and resorts throughout the world which our law firm represents in regard to meeting and convention issues. The hotel has referred to me your recent correspondence, and I have had the chance to review it and to confer with appropriate hotel personnel.

      The hotel respectfully rejects your invitation to reduce the room block, and your invitation to accept a cancellation with no damages.

      As you surely know, the contract between the parties provides at page 2 that if your client cancels any of the events set forth in the contract, the hotel has the right to adjust the terms of the contract for any remaining events to prevailing market conditions. In light of your client's cancellation of the event at the Gaylord Rockies, the Philadelphia Marriott Downtown will make such adjustments. The changes in red on the attached document indicate what those changes will be.

      The contract further provides that if the group's credit is not approved, the group shall pay an advance deposit in an amount to be determined by the Hotel in its reasonable discretion. You have communicated to the Hotel that your client has been contemplating bankruptcy or a restructuring. Given this report of financial difficulty, your client's credit cannot be approved. For this reason, the Hotel requires a deposit of fifty percent of the total room block, at the new rates set forth in the attachment, and fifty percent of the new food and beverage revenue amount, to be received by the Hotel within the next thirty days, and the remaining fifty percent of that amount six months before your contracted arrival date.

      Please feel free to contact me if you should have any questions.

Philadelphia Marriott Downtown / Romance Writers of America
February 20, 2024
Page 2

Sincerely,

Steven M. Rudner